JENNIE V. FARRELL, Appellant, v. GEORGE FARRELL et al., Appellees.

**DIVORCE: Custody of Children—Arbitrary Refusal to Entertain Application.** A court, having in divorce proceeding entered a professedly temporary order as to the custody of a child, may not arbitrarily refuse to entertain the mother's application for a permanent order in her favor, on the sole ground that the mother has, in violation of the law of this state, contracted a marriage within the year following the divorce decree.

**MARRIAGE: Validity.** Principle reaffirmed that a marriage contracted by a divorced person within the year following the decree of divorce, and without the permission of the court, is valid. (Sec. 3181, Code Supp., 1913.)

*Appeal from Wapello District Court.*—F. M. HUNTER, Judge.

FEBRUARY 8, 1921.

THE opinion sufficiently states the nature of the proceeding and material facts. The petition having been dismissed, plaintiff appeals.—*Reversed.*

*W. W. Epps,* for appellant.

*J. A. Lowenberg,* for appellees.

WEAVER, J.—The plaintiff and defendant were formerly husband and wife. After a married life of about three years, they were divorced, at plaintiff's suit, by the district court of

1. DIVORCE: custody of children: arbitrary refusal to entertain application.

Wapello County, Hon. F. M. Hunter, judge, presiding. In that proceeding, plaintiff asked to be awarded the custody of the only child of the marriage, a boy then two years old, and the decree of divorce made provision with reference thereto in the following words:

"It further appears to the court that the minor child of the parties, George W. Farrell, is now with his grandmother, under a temporary order of this court. It is ordered that said temporary order be continued for the present, the court reserving to itself the right to make and enter a permanent order as to the custody of said child, either upon its own motion or upon the application of either party, and the cause is continued for that purpose. It is further ordered that plaintiff shall have the right to visit her child at all reasonable times, without molestation or interference on part of defendant, the grandmother of said child, or any other person of their household."

This decree and order were dated February 9, 1918. On November 29, 1919, plaintiff filed in said district court an application to modify the decree, and award to her the care and custody of her child. In support of that application, she states that the original order placing the child in the temporary care of its grandmother was made for the reason that the child's father had failed to support the plaintiff or child, and left them no home or means on which to live; that she is now married to one Strandberg, who joins with her in desiring the care and custody of the child; that they have a good comfortable home and plenty on which to live comfortably, and that her said husband is a good machinist, earning $30 to $35 per week; that Annie Farrell, now holding the temporary custody of the child, is not a suitable or proper person to have him in charge, and teaches the child to hate its mother. Plaintiff further says she

has a mother's love for her child, and a respectable and comfortable home in which to rear him. She therefore asks the court to fix the time when the application will be heard and the notice given. On this application, the court named January 31, 1920, as the time, and the courthouse at Ottumwa, Iowa, as the place for the hearing upon plaintiff's application for modification of the decree.

At the time and place named, plaintiff appeared, in person and by counsel, together with witnesses whose testimony she proposed to offer, in support of the truth of said application. The defendant Anna Farrell also appeared with counsel. Both parties having announced readiness for trial, the court summarily commanded the plaintiff to take the witness stand, and proceeded itself to examine her minutely as to her conduct since she was divorced from George Farrell. Answering the court's question, she said:

"My name is Jennie V. Strandberg—formerly Jennie V. Farrell. I got a divorce here a year ago. I was here and testified, and after those proceedings I married again. In about a month after the divorce, I married John Batterson."

(At this point, the court interrupted, and called, "Mr. Clerk, get me the papers in the case—Jennie Batterson v. John Batterson.") The examination then proceeded as follows:

"I was married that time in Rock Island, Illinois. Came back here. Lived here not very long. I got a divorce from Batterson. Don't remember the date. Got it here in this court. After I got the divorce, I married again. Married Strandberg. Was married at Chillicothe, Missouri. After the divorce from Farrell, I went over to Rock Island and got married. It was not right away, but it was within a year. Q. Why did you go over there to get married? A. Why, so I could get a home for my child. Q. Why did you go over there to get married? Why didn't you get married here? A. Well, I didn't know. They told me I couldn't. Q. Which child was it you wanted to get a home for? A. The only one I have. That little boy. Q. He was already provided with a home, wasn't he? A. Yes, but they told me as soon as I got a home for him I could have him. Q. Have you ever gotten him? A. No, I have not. I have tried for two years to get my child, but I have not got him yet.

I was divorced from Farrell in February, 1918, and from Batterson in September, 1918. Married to Strandberg in March, 1919. Married at Chillicothe, Missouri. Was living here. Went to Missouri to get married. Was told to go there, and I listened to my mother.''

At this point, the court made an announcement as follows:

''The court holds that this woman, having lived in illicit relationship with two different men, one in 1918, following her first decree, and the other one in 1919, following her second decree, and by her contemptuous disregard for the laws of this state and the decrees of this court, does not have any standing in this court to ask from it the modification of the decree of February 9, 1918, and the court declines to hear her application, further than to dismiss it.''

Thereupon, plaintiff's counsel asked and obtained leave to ''cross-examine'' his client. She testified:

''I was only 17 years old when I married Farrell. My mother made me marry him. He left me with no property—nothing. When the divorce was granted, they told me I could go and see my baby, but she refused me. She told it in court that I could see my child, but she refused me at the door. I have gone there many times, and have been refused. Have never had its association or had it with me. I live with my husband, Strandberg, here in the city. He is making a living for me. Have a comfortable home. This is the only child I have. I am attached to it and, as its mother, want to have its care and custody. I have witnesses here, ready to establish the fact that I have decent, comfortable home, and live in moral surroundings,—a home fit to raise any child in,—and to show that the present home of the child is not a fit place. I was led to marry Batterson because he promised to fix a home, so I could get my baby. I got a divorce from him because he treated me cruelly, and wanted me to be 'onnery' to support him.''

At the conclusion of this testimony, her counsel, Mr. Epps, stated to the court that his client was in court, prepared to show that she has a suitable home for her child, and that she is being refused the right of visitation provided for her under the decree of divorce. To this the court replied as follows:

''The court now calls attention to the decree signed in case

No. 9426, chancery, Jennie V. Farrell against George Farrell, of date February 9, 1918, filed February 18, 1918, and found recorded in Book 45, page 321, of the records of this court. And also the decree granted in the case of Jennie Batterson against John Batterson, being Chancery No. 9840, and to the decree of divorce signed therein on the third day of September, 1918, and filed on the same date. In neither of the said decrees is it provided that the plaintiff might remarry within a year. From the record already made, it appears that she was married very soon after the first decree, and obtained a divorce in September, and was married again the following March. She has no respect for the laws of the state and the decrees of the court, and she has no standing to make a showing for further relief in this case, and the court declines to hear her application, further than to dismiss the same. To all of which the plaintiff is granted an exception.''

From the court's order dismissing her application without a hearing, the plaintiff has appealed. The question thus presented may be stated and considered as follows:

I. As to the relation of the plaintiff to the case in which she asks a modification of the decree, it is conceded that she was plaintiff in the divorce proceeding asking a dissolution of the marriage between her and Farrell, and for an award to her of the custody of her young child. The decree as entered granted her a divorce, as prayed, but for the time being withheld any final adjudication of the right to the custody of the child. The language of the decree in this respect is as follows:

''It further appearing to the court that the minor child of the parties is now with his grandmother, under a temporary order of this court, it is ordered that the temporary order be continued for the present, the court reserving to itself the right to make and enter a permanent order as to the custody of said child, either upon its own motion or upon the application of either party, and the cause is continued for that purpose. It is further ordered that plaintiff shall have the right to visit her child at all reasonable times, without molestation or interference on part of the defendant, the grandmother, or any other person of their household.''

It will be seen that this order was made as a mere *tempo-*

*rary* expedient; that the question of the *permanent* custody
was held in abeyance, with an express recognition of the right
of either party to make application for such permanent order;
and that the cause was retained on the docket for that purpose.
When, therefore, plaintiff appeared in court and asked that the
order for the permanent custody of her child be settled, and
presented her own claim to such appointment and asked for a
hearing thereon, and offered to prove the matters and things
stated in her application, she asked no more than a recognition
of the rights which the court itself had guaranteed to her in the
decree of divorce.    Moreover, even if the decree had not con-
tained the provisions referred to, the order of the court award-
ing the custody of the child to either party or to a third person
was not a finality, and was by statute subject to changes ''when
circumstances render them expedient'' (Code Section 3180);
and surely, if this be true as to so-called awards of permanent
custody of children, it is, for a much stronger reason, true when
the award is expressly made temporary, or is held in abeyance.
Plaintiff was, therefore, clearly within her rights in presenting
her application to the court and demanding a hearing thereon.

II.    Did the court err in refusing to give the plaintiff a
hearing upon her application?    In our judgment, this must be
answered in the affirmative.    There was a time in the earlier
development of law in England when it was competent for a
court, by decree or judgment, to pass sentence of outlawry upon
individuals convicted of certain offenses.    From a person thus
adjudged an outlaw, all protection of the law was withdrawn.
No court would entertain a suit in his favor, or grant him re-
dress from any wrong.    He was a man without rights.    He for-
feited everything he had, either in right or possession.    To kill
him was no crime.    With advancing civilization, that blot upon
our legal history disappeared, and it is now the boast of both
England and America that the protection of the law extends
to every right of every individual, without regard to his station
in life, and without regard to the court's impression as to his
personal character.    Bad men and bad women have the same
claim upon the law for protection of their personal and property
rights which is possessed by those of more exemplary character,
and the courts of competent jurisdiction to hear and try their

complaints are not clothed with authority or power to brand them as outlaws by arbitrarily closing the doors of the temple of justice against them.

We are sure that the learned judge of the trial court would not consciously or intentionally do this plaintiff an injury; but that the ruling from which appeal is taken works an injustice is very clear. This has resulted, to some extent at least, from the apparent misconception by the court of the real nature of plaintiff's conduct, which it so severely condemns. In refusing to listen to plaintiff's application, the court said that this woman had lived in illicit relations with two different men in the years 1918 and 1919, and that, because of this and her contemptuous disregard of the law and decree of the court, it would not hear her application, except to dismiss it. This is a very serious charge to be made by a court against a litigant at its bar, and, so far as the record shows, is wholly without support in the evidence. It is true that plaintiff had been twice divorced, and that each divorce was followed by another marriage within less than a year. It is also true that we have a statute, Code Supplement, 1913, Section 3181, which provides that, where divorce is granted, neither party shall marry again within a year, except by permission of the court in the decree, and that anyone marrying contrary to the provisions of this act shall be deemed guilty of a misdemeanor. There is no provision declaring void the marriage of a divorced person within the year. The act is made a misdemeanor, as is also the case where a marriage is solemnized without a clerk's license; but, in the absence of any provision in express words, or by necessary implication, making such marriage void, the parties to such union cannot be said to be living "in illicit relationship." In this case, however, neither of the plaintiff's remarriages was solemnized in Iowa. In an entirely parallel case we have held such marriage valid. *Dudley v. Dudley,* 151 Iowa 142.

In that case, as in this, husband and wife were divorced, and soon thereafter, and within the year, the wife went temporarily to Nebraska, and there married another man, and then returned with him to her home in Iowa. Her former husband, conceiving that this marriage was illegal, and afforded sufficient

2. MARRIAGE: validity.

ground to secure a modification of the order as to custody of a child, began proceedings for that purpose. On appeal, we held that the marriage in Nebraska was not unlawful, even though that state had a somewhat similar statute of its own. Speaking by Deemer, J., we said:

"Such statutes as the one existing in this state or the one copied from the Nebraska statutes have no extra-territorial effect. The original decree was passed in this state, where the parties were domiciled. Defendant, on the advice of an attorney, went to Nebraska, and there married Mullen, and soon returned to this state, where she has since lived with him as his wife. This act was not in violation of our law, as it took place in Nebraska. It was not in violation of the Nebraska statute, for the reason that no decree was entered in that state forbidding the marriage. The marriage was good in Nebraska, where consummated, and, being valid there, was valid when the parties returned to this state."

Unless we are prepared to overrule that precedent, it stands as the law of this state. We are not disposed to deny its authority, nor question the essential justice of the rule there applied. It is perhaps true that this woman, by her successive marriages, has shown lack of wisdom and want of due regard for the conventionalities of society; but the record before us is barren of any proof upon which she may be branded as a harlot or loose-minded wanton, without right to petition the court for recognition of her claim as a mother to the care and nurture of her own babe. It is true, as we have already noted, that she was twice divorced; but it should not be overlooked that, in each instance, she was found to be the innocent party, entitled to be relieved from further conjugal relation with a man by whose brutality her life had been endangered. Aside from her act in remarrying, there is no suggestion by court or counsel that her life, character, and habits are not exemplary, or that she is not competent and qualified to be trusted with the proper discharge of the duties pertaining to her natural guardianship of her young son. Such guardianship is not a gift or grant, to be bestowed or taken away at pleasure, even in the name of the law. It has its root and source in a power which is above the law of man. True, the law may and will interpose for the

protection of childhood against neglect and abuse by unnatural and incompetent parents; but, in the absence of good reason for such interference, it jealously guards the parental right to the custody, care, nurture, and companionship of the child. This is particularly true as between the mother and young children, where the marriage relation of the parents has been dissolved on account of the fault or wrong of the father. To this point, in *Caldwell v. Caldwell*, 141 Iowa 192, 195, we said:

"No argument is required to support the proposition that a permanent abode is for a child's best interest, and rarely indeed will a divided custody by parents who have separated prove beneficial. Nature has devolved upon the mother the care and nurture of her children in tender years, and during that time, save in exceptional circumstances, she is best fitted and most inclined to look after their welfare. Moreover, courts are inclined to award the custody of children to the innocent party, on the theory that better treatment may be anticipated from a person who has observed the marriage vows than from him who has violated them."

The soundness of the rule thus applied in the cited case cannot be denied, and the question of the permanent custody of this child having been expressly reserved for further consideration, with leave to either party to call it up, on application therefor, the mother was entitled to be heard, and if, on such hearing, she made a reasonably fair showing of her ability to care for the child, and her moral character was not successfully impeached, then, as between her and the former husband and the grandmother, she would have been entitled to an order restoring the child to her custody.

In view of the fact that the sole reason assigned by the trial court for refusing consideration of plaintiff's application was her conduct in marrying again within the year, we think it proper to say that, these marriages being valid, her act in contracting them does not of itself work a forfeiture of her rights as a mother. As to the moral quality of her act in going out of the state in order to be legally married, we are not called upon to pass judgment. It is not to her discredit, however, that she sought a *legal* marriage; and, it being legal, it is not within the province of the court to penalize it by excluding her from

access to its bar, when she has a right to be enforced or a wrong to be redressed.

The courts may not allow the mere human side of a transaction to obstruct the course of legal justice, but there is a wide field in which both the legal and moral quality of a deed depends so largely upon the motive and intent of the doer that cases are rare in which the virtue of charity is entirely out of place, or in which we may not with profit remember the exhortation of the Poet Plowman:

"Then gently scan our brother man,
    Still gentler sister woman;
  Tho' ane may gang a kennin' wrang,
    To step aside is human."

This case is not without its legitimate call upon our human sympathies. If we may put any confidence in plaintiff's story (and under the trial court's ruling this is all we have), her chief weakness seems to have been her readiness to listen to what "they said" and what "they told me," and her obsession from the day of her divorce has been the making of a "home" for her "baby." It was the promise of the unspeakable Batterson to provide a home for herself and baby which led her to marry him, and it is to her honor that, as soon as this man revealed to her his real nature, she repudiated and divorced him. Her present husband, Strandberg, has furnished her a comfortable home, and naturally her heart turns with increased longing toward her child. It is her claim, and there is color of corroboration in the circumstances, that the order committing the child to the grandmother was made temporary only, to give her opportunity to make or find a home, and with the promise that, when she had done so, her babe should be returned to her. Now that she has performed that condition, and asks the sacred privilege of caring for her only child, she finds the grandmother's door shut against her entrance, and the court, which holds the master key to the situation, refusing to listen to her complaint. This should not be. She may be unworthy of the relief she asks, but neither this court nor the trial court is commissioned with authority to so say, except upon a full and fair hearing, in which her unworthiness is established by competent evidence.

The order appealed from is reversed, and cause remanded for further proceedings not inconsistent with this opinion.—*Reversed and remanded.*

EVANS, C. J., PRESTON and DE GRAFF, JJ., concur.